# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| MURIEL IKEDA,<br><br>               Plaintiff,<br><br>     vs.<br><br>CITY & COUNTY OF HONOLULU, *et al.*,<br><br>          Defendants. | Case No. 19-cv-00009-DKW-KJM<br><br>**ORDER (1) GRANTING AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS; AND (2) DISMISSING COMPLAINT IN PART WITH PARTIAL LEAVE TO AMEND** |

Plaintiff Muriel Ikeda, on behalf of her deceased son, Cameron Johnson, brings this civil rights action against the City & County of Honolulu (the "City") and Honolulu Police Department Officer Scott Valdez. On January 13, 2017, Johnson was at Malaekahana Beach Park in the driver's seat of a parked vehicle that was suspected of being stolen when he was shot multiple times by Officer Valdez. Ikeda asserts eleven claims, including use-of-excessive force in violation of the Fourth Amendment to the United States Constitution.

Two motions to dismiss are now before the Court filed by the City and by Officer Valdez, respectively. Dkt. Nos. 17, 21. Because the Court concludes that Officer Valdez is not entitled to either qualified immunity or a state law qualified privilege at this early stage in the proceedings, Officer Valdez's motion is DENIED with respect to Ikeda's Fourth Amendment claim. The Court likewise DENIES

Defendants' motions directed towards Ikeda's tort claims to the extent based on the absence of or breach of a duty. But because Ikeda has failed to allege sufficient facts to support the inference that a policy, practice, or custom of the City was the moving force behind the death of her son, the City's motion is GRANTED, albeit with leave to amend, with respect to Ikeda's *Monell* claim. The balance of Ikeda's eleven claims is addressed below.

## FACTUAL & PROCEDURAL BACKGROUND

Late in the afternoon on January 13, 2017, Officer Scott Valdez of the Honolulu Police Department ("HPD") responded to a 911 call about a stolen 1997 Toyota Tacoma located at Malaekahana campgrounds in Laie. Dkt. No. 14, ¶¶ 7–9. When Officer Valdez arrived at Malaekahana, Cameron Johnson was in the parking lot, sitting at the wheel of a parked vehicle that matched the 911 caller's description of the stolen pickup truck. Dkt. No. 14, ¶¶ 8–10.

Officer Valdez approached the pickup truck, which was parked at a slight incline, and engaged in a brief conversation with Johnson at the driver's side window. *Id.* at ¶¶ 10, 12. Johnson was the only occupant, *id.* at ¶ 10, and the vehicle was not running. *Id.* at ¶ 11. Officer Valdez ordered Johnson to show his hands and Johnson complied. *Id.* at ¶ 14. What happened next is disputed by the parties.

According to Officer Valdez's report, Johnson started the truck,[1] put it in gear, and ignored repeated commands to turn off the vehicle. *Id.* at ¶¶ 15, 19–20. Officer Valdez related that Johnson placed the vehicle in reverse, and in the process, struck Officer Valdez's left arm with the driver's side mirror. *Id.* at ¶ 20.

With that, Officer Valdez drew his firearm—and while walking alongside the vehicle as it slowly rolled backward—fired five shots at Johnson. *Id.* at ¶¶ 21–22. The rounds pierced Johnson's left shoulder, left breast, mid-back, and two places in his left arm. *Id.* at ¶ 22. After Johnson's vehicle came to rest against another, witnesses observed Officer Valdez reach across Johnson's body, remove a backpack from the cab of the truck, and empty the backpack's contents on the ground. *Id.* at ¶ 25. Johnson was later pronounced dead at the hospital. *Id.* at ¶ 27.

On January 10, 2019, Ikeda, Johnson's biological mother and representative of his estate, initiated this lawsuit against the City and Officer Valdez (collectively "Defendants"). Dkt. No. 1. After Defendants moved to dismiss the complaint (Dkt. No. 8), they agreed to allow Ikeda to amend (Dkt. No. 12), resulting in the first

---

[1] It is unclear as to how (or if) the vehicle was started. A key for the vehicle was never recovered from the scene. Dkt. No. 14, ¶ 16. Oliver Fix, the owner of the reportedly stolen truck, informed police that, at the time of the incident, he was in possession of the only key to the truck. *Id.* at ¶17. Although Officer Hyong Sup Kim initially reported that the ignition was damaged, an inspection of the vehicle by an HPD mechanic later revealed that "the ignition was intact and fully operable." *Id.* at ¶ 18. The reasonable inference, then, seen in the light most favorable to Ikeda, is that Officer Valdez's report was wrong, and the truck was not started and/or that Johnson's vehicle was not the one subject to the stolen vehicle report, and Officer Valdez was questioning the wrong man.

amended complaint ("FAC")(Dkt. No. 14). Defendants have moved separately under Rule 12(b)(6), seeking the dismissal of the FAC. Dkt. Nos. 17, 21.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). To satisfy this requirement, a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A complaint may be deficient for failure "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

On a Rule 12(b)(6) motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw "any reasonable inferences" in favor of the plaintiff. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008). To that end, a court must judge the sufficiency of a complaint under a two-pronged approach: (1) disregard all "legal conclusions" and "conclusory statements"; and (2) determine

whether the remaining "well-pleaded factual allegations," accepted as true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–81 (2009).

Accordingly, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. That is, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). If, from the well-pleaded facts, the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

//

//

//

# DISCUSSION

Ikeda asserts eleven counts in the FAC.[2]  As a preliminary matter, Ikeda now concedes that, under the U.S. Constitution, she cannot state a Fifth Amendment claim (Dkt. No. 20 at 13) or a Fourteenth Amendment claim for deprivation of substantive due process (Dkt. No. 25 at 6).  Therefore, these claims are DISMISSED WITH PREJUDICE.

Defendants' respective motions also urge the Court to dismiss Ikeda's other claims.  *See* Dkt. No. 21-1; Dkt. No. 17-1.  For the reasons that follow, the remaining claims against Officer Valdez stand, while Counts III and VIII against the City are DISMISSED, albeit with leave to amend.[3]

---

[2]The claims asserted are as follows: (Count I) use-of-excessive-force in violation of the Fourth, Fifth, and Fourteenth Amendments to both the federal Constitution and the Hawaii Constitution; (Count II) deprivation of substantive due process under the Fourteenth Amendment to the federal Constitution; (Count III) municipal liability under 42 U.S.C. Section 1983; (Count IV) wrongful death; (Count V) negligence; (Count VI) gross negligence; (Count VII) assault and battery; (Count VIII) negligent training; (Count IX) intentional infliction of emotional distress; (Count X) negligent infliction of emotional distress; and (Count XI) *respondeat superior*.  Dkt. No. 14 at 6–17.

[3]To the extent Ikeda alleges violations of the Hawaii Constitution in Count I, the City insists upon dismissal because Section 1983 is only a vehicle for enforcing rights guaranteed by federal law.  Dkt. No. 17-1 at 5.  Although that is correct, dismissal is inappropriate.  Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory" or for failing to "expressly" invoke a particular right of action.  *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).  To overcome a Rule 12(b)(6) motion, Ikeda was only required to state "*factual* allegations" showing an entitlement to relief.  *Id.* at 12.  She has done just that insofar as it concerns Count I.  Whether Ikeda has a viable claim under the Hawaii Constitution is a question the Court leaves for another day when the parties have fully briefed the issue.

## I.    Officer Valdez's Motion to Dismiss

### A.    Section 1983 – Individual Liability (Count I)

In Count I, Ikeda asserts a claim under 42 U.S.C. Section 1983, alleging that Officer Valdez used excessive force when he shot Johnson.  Dkt. No. 14, ¶¶ 32–33. In defense, Officer Valdez maintains that he is insulated by qualified immunity. Dkt. No. 17-1 at 9–12.  At least at this stage, the Court disagrees.

Under federal law, qualified immunity will shield a government official from liability for civil damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The sequence in which these prongs are addressed is discretionary. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In conducting the analysis, the Court "is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question.  Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S.Ct. 2003, 2007 (2017) (*per curiam*) (citation and internal quotation marks omitted).

As detailed below, Officer Valdez is not entitled to qualified immunity because Ikeda has pled facts that—when "[t]aken in the light most favorable" to

Ikeda, *Saucier v. Katz*, 533 U.S. 194, 201 (2001)—show that Officer Valdez violated Johnson's Fourth Amendment right to be free from excessive force, and at the time of the incident, that right was clearly established, such that "any reasonable official in [Officer Valdez]'s shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) (citation and internal quotation marks omitted).

### 1. Use of Excessive Force in Violation of the Fourth Amendment

"When a plaintiff alleges excessive force during an *investigation or arrest*, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (emphasis added). The test for whether an officer used excessive force is "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 395, 399 (1989). "Reasonableness" is evaluated based on "the totality of the circumstances," *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985), viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A non-exhaustive list of factors relevant to this inquiry include: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape." *Maxwell v. Cty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012) (citing *Graham*, 490 U.S. at 396).

*Deadly* force is reasonable, however, only if "the officer has probable cause to believe that the suspect poses *a significant threat of death or serious physical injury to the officer or others*." *Garner*, 471 U.S. at 3 (emphasis added); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (*en banc*). Although "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 396–97, "an officer must give a warning before using deadly force whenever practicable." *Gonzalez*, 747 F.3d at 794 (citation and internal quotations omitted); *Garner*, 471 U.S. at 11–12. Hence, the availability of "alternative methods of capturing or subduing a suspect" is relevant to whether the use of deadly force was reasonable. *Gonzalez*, 747 F.3d at 794.

Officer Valdez contends it was objectively reasonable under the circumstances for him to employ deadly force by firing his weapon five times at Johnson because Johnson: "(1) was in a stolen vehicle which made him a felony suspect, (2) refused to obey officer commands to show his hands and turn off the vehicle, (3) was operating a moving vehicle, (4) struck a uniformed police officer with the stolen vehicle, and (5) posed an immediate threat to the safety of the officer and other bystanders and members of the public." Dkt. No. 21-1 at 9. Viewing the

facts in the light most favorable to Ikeda, however, the Court concludes that Officer Valdez's use of deadly force was not objectively reasonable.

As a threshold matter, it bears emphasis that Officer Valdez has taken certain liberties in construing the facts alleged in the FAC. That is a luxury this Court does not have. *See Twombly*, 550 U.S. at 555. This is especially true given that "[d]eadly force cases pose a particularly difficult problem . . . because the officer defendant is often the only surviving eyewitness." *Gonzalez*, 747 F.3d at 794 (citation and internal quotation marks omitted). "Because the person most likely to rebut the officers' version of events—the one killed—can't testify," the Ninth Circuit has held that courts should "carefully examine all the evidence" produced during discovery and grant summary judgment "sparingly" in excessive force cases. *S.B. v. Cty. Of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017) (citation and internal quotation marks omitted). That challenge is compounded here by the fact that discovery has yet to occur. This matter is only before the Court on a *motion to dismiss* the FAC and therefore, at the very least, there remain triable issues of fact.

As stated, the controlling question is whether Officer Valdez had "probable cause to believe that [Johnson] pose[d] *a significant threat of death or serious physical injury to [Officer Valdez] or others*." *Garner*, 471 U.S. at 3. Probable cause existed if "at the moment [Officer Valdez fired his weapon] . . . the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy

information were sufficient to warrant a prudent man in believing" that Johnson posed a threat of death or serious injury to the officer or others. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *cf. Garner*, 471 U.S. at 3.

Here, assuming the 911 call provided sufficient, trustworthy information that was then independently verified by Officer Valdez, *see Draper v. United States*, 358 U.S. 307, 313 (1959), Officer Valdez approached Johnson knowing only that Johnson was in a vehicle that "matched the description" of a pickup reported stolen in the area. Dkt. No. 14, ¶ 9; *id.* at ¶¶ 7–14. Ikeda disputes the events that followed as recorded in Officer Valdez's report. *See id.* at ¶¶ 15–16, 19–21. Therefore, at best, Officer Valdez had probable cause to arrest Johnson for the felony offense of vehicle theft. *See* Hawaii Rev. Stat. §§ 708-810, -836.

But not all felony offenses are treated equally when it comes to the use of deadly force, as Officer Valdez appears to assert. *See Garner*, 471 U.S. at 21 ("[T]he fact that Garner was a suspected burglar could not, without regard to the other circumstances, automatically justify the use of deadly force."); Dkt. No. 26 at 4–5. For good reason, the law does not grant law enforcement carte blanche authority to use lethal weapons against all suspected felons, even if they are fleeing. *Garner*, 471 U.S. at 11, 19. Only if a suspect "has committed a crime involving the infliction or threatened infliction of serious physical harm" is an officer permitted to use

deadly force. *Id.* at 11. So while stealing laptops from the trunk of a car may be a serious crime, rising to the level of a felony, it is not one that presents a "threat of death or serious injury" so as to justify the use of deadly force. And Officer Valdez's inchoate fear that Johnson otherwise "posed a risk of harm," *see* (Dkt. No. 21-1 at 11), is not grounded in the FAC. Rather, when viewing the few undisputed facts in this case from the perspective of a reasonable officer on the scene, there was no probable cause to believe that an immediate threat to Officer Valdez or others existed. As such, Officer Valdez was prohibited from using deadly force.

Officer Valdez resists this conclusion by contending that the use of deadly force was necessary to "prevent [a suspected felon]'s flight." *See* Dkt. No. 21-1 at 11; Dkt. No. 26 at 4. But *Garner* is explicitly clear: "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." 471 U.S. at 11. As the Supreme Court explained:

> It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.

*Id.*

Therefore, regardless of whether Johnson was fleeing simply because the vehicle "slowly rolled backwards," (Dkt. No. 14, ¶ 21), the fact remains that "even

when a felony suspect tries to escape, 'where the suspect poses no immediate threat to the officer and no threat to others, the harm from failing to apprehend him does not justify the use of deadly force to do so.'" *Rodriguez v. Swartz*, 899 F.3d 719, 729 (9th Cir. 2018) (quoting *Garner*, 471 U.S. at 11). For that reason, a reasonable fact-finder could and would conclude that it was objectively unreasonable for Officer Valdez to apprehend "an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11.

To be sure, this is not a case where the vehicle "was accelerating, its tires were spinning, mud was flying up" and the officer "thought [his partner] had been run over" and was potentially in danger. *Wilkinson v. Torres*, 610 F.3d 546, 551–52 (9th Cir. 2010) (granting summary judgment to the officer). Nor does this case involve a suspect that has led officers on a foot chase before occupying a vehicle and beginning to drive in the direction of, among others, the other officers on foot, thereby "prov[ing] he would do almost anything to avoid capture." *Brosseau v. Haugen*, 543 U.S. 194, 196–97, 200 (2004). And the Court is not being asked to second-guess an officer's attempt to terminate a dangerous high-speed chase that endangered the lives of officers and bystanders. *See, e.g.*, *Mullenix v. Luna*, 136 S.Ct. 305, 310 (2015) (suspect "had led police on a 25-mile chase at extremely high speeds, was reportedly intoxicated, had twice threatened to shoot officers, and was racing towards an officer's location."); *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2017–

18, 2021 (2014); *Scott v. Harris*, 550 U.S. 372, 374–75 (2007). To the contrary, the facts viewed in the light most favorable to Ikeda show that Johnson was not attempting to avoid capture or to flee at all, and that the vehicle's engine was not even on making it difficult to see how it could be otherwise. Further, how the side mirror managed to brush the officer, if it did at all, remains to be explored, as does the propriety and proportionality of Officer Valdez's response.

Moreover, given the circumstances alleged in the FAC, a jury is entitled to consider the availability of alternative methods for subduing Johnson, *i.e.*, whether Officer Valdez could have used "a police baton, pepper spray, [or] a taser" or whether "he could have shot [Johnson] in a nonlethal area of the body to try to stop him from driving further." *Gonzalez*, 747 F.3d at 797. "If the jury found that the car was moving slowly at the time"—as Ikeda alleges—the jury "could also find that other alternatives could have been used and that the use of deadly force was unreasonable." *Id.*; Dkt. No. 14, ¶ 21.

As suggested throughout, discovery may reveal facts leading to a different result on summary judgment or at trial. But here at the pleading stage, the Court holds that Ikeda has alleged plausible facts showing that Officer Valdez used objectively unreasonable force in violation of the Fourth Amendment.

## 2.     Clearly Established Law

Government officials may violate citizens' constitutional rights, and yet they are entitled to qualified immunity unless "the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).[4]   Thus, the remaining qualified immunity inquiry is whether it was clearly established on January 13, 2017—the date of the incident—that it is unlawful for an officer to walk parallel to a suspected stolen vehicle, as it slowly rolls backward in a parking lot, and fire his weapon multiple times at the individual in the driver's seat.  So framed by the alleged facts, there is no doubt that it was because any reasonable officer would agree such conduct is unlawful.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S.Ct. at 308 (citation and internal quotation marks omitted).  Because "a reasonably competent public official should know the law governing [his] conduct," *Harlow*, 457 U.S. at 819, "the focus is on whether the officer had fair notice that [his] conduct was unlawful," based on "the law at the time of the conduct."  *Kisela*, 138 S.Ct. at 1152 (quoting *Brosseau*, 543 U.S. at 198).  To that

---

[4]"[T]he 'clearly established' inquiry is a question of law that only a judge can decide . . . . once the factual issues are resolved."  *Morales v. Fry*, 873 F.3d 817, 821, 823 (9th Cir. 2017) (citation omitted).

end, "controlling authority" or "a robust consensus of cases of persuasive authority" must "clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S.Ct. at 589–90 (citations and internal quotation marks omitted). This does "not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Mullenix*, 136 S.Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741).

In analyzing this question, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality" or "as a broad general proposition." *Mullenix*, 136 S.Ct. at 308 (citations and internal quotation marks omitted). Instead, "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (citation and internal quotations omitted). This "is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S.Ct. at 308 (citation and internal quotation marks omitted). As a result, the "clearly established" analysis in the excessive force context generally requires the court to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 137 S.Ct. at 552.

"It is not necessary, of course, that the very action in question has previously been held unlawful." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1866 (2017) (citations and internal quotation marks omitted). And "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *See, e.g.*, *White*, 137 S.Ct. at 552 (citation and internal quotation marks omitted); *Kisela*, 138 S.Ct. at 1153. Because *Graham* and *Garner* "lay out excessive-force principles at only a general level," *White*, 137 S.Ct. at 552, those cases by themselves serve as clearly established law only in "an obvious case." *Id.* (quoting *Brosseau*, 543 U.S. at 199); *Kisela*, 138 S.Ct. at 1153; *Plumhoff*, 134 S.Ct. at 2023 (emphasizing that *Garner* and *Graham* are "cast at a high level of generality"); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

This is such an obvious case. "It does not take a court ruling for an official to know that no concept of reasonableness could justify the unprovoked shooting of another person. Any reasonable officer would have known, even without a judicial decision to tell him so, that it was unlawful to kill someone—anyone—for no reason." *Rodriquez*, 899 F.3d at 733 (citation and internal quotation marks omitted). Indeed, "qualified immunity protects actions 'in the hazy border between excessive and acceptable force.'" *Mullenix*, 136 S.Ct. at 305 (citations omitted). Here, there is nothing "hazy" about the legal backdrop against which Officer Valdez acted.

Even so, at least two similar cases dispel any doubt that Officer Valdez had fair notice that his conduct was unlawful. *See, e.g.*, *Adams v. Speers*, 473 F.3d 989 (9th Cir. 2007); *Acosta v. City & Cty. of San Francisco*, 83 F.3d 1143 (9th Cir. 1996).[5] First, over two decades ago in *Acosta*, the Ninth Circuit refused to grant qualified immunity to an officer who shot a suspect in a vehicle that, perhaps, was "slowly moving." 83 F.3d at 1147–48. There, an officer heard a woman scream and saw two young men running with what he thought was a purse. The officer drew his pistol and chased the suspects around the block where they entered a car. The officer then fired two shots, killing the driver. *Id.* at 1144. There were some factual disputes, including whether one of the passengers said "Run him over"; whether the vehicle was moving (and how fast); and, if so, whether the vehicle was moving in the direction of the officer. *Id.* Nevertheless, in rejecting the officer's qualified immunity defense, the court held that "the law governing 'shooting to kill' a fleeing suspect is clearly established" and "a reasonable officer could not have reasonably

---

[5]Officer Valdez, on the other hand, points to *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1994), for support. But *Reese* is a far cry from the facts of this case. There, a bank robbery had occurred, and the four suspects led a police officer on a car chase at speeds of forty to sixty miles per hour before the getaway car spun out of control and came to a stop in front of the officer's patrol car. *Id.* at 495–96. The officer drew his gun and repeatedly ordered the suspects to raise their hands, but the front-seat passenger (plaintiff's son) "repeatedly reached down in defiance of [the officer's orders]," reaching below the officer's line of sight at least twice, and it was on the second time—when the suspect "tipped his shoulder and reached down further"— that the officer shot the suspect once in the head, killing him. *Id.* at 496, 500–01. Here, however, nothing in the FAC states that Johnson was lowering his hands to retrieve what might potentially be a weapon.

believed that shooting at the driver of the slowly moving car was lawful." *Id.* at 1148.

Second, in *Adams*, an officer joined other officers in pursuing a suspect that had committed several traffic violations and refused to stop. 473 F.3d at 991. The officer twice used his squad car to ram the suspect's vehicle, the second time causing both vehicles to fall into an embankment. *Id.* Once several patrol cars had surrounded the suspect's vehicle, the suspect "began to inch [his vehicle] backwards, at no more than 4 to 5 miles per hour, turning slowly to the left" so that the front of his vehicle swung "towards [the defendant-officer's] patrol vehicle." *Id.* at 992. The officer exited his patrol car, stood in front of the suspect's vehicle—"as it rolled backwards away from him"—drew his service weapon and, without warning, fired six rounds, killing the suspect. *Id.* at 992. In holding that the officer was not entitled to qualified immunity, the Ninth Circuit distinguished the facts from cases like *Brosseau*, 543 U.S. at 196–97, noted *supra*, concluding that the "case falls within the obvious." *Adams*, 473 F.3d at 994.

These cases "clearly prohibit [Officer Valdez]'s conduct in the particular circumstances before him." *Wesby*, 138 S.Ct. at 590. As such, viewing the alleged facts in Ikeda's favor, "any reasonable official" in Officer Valdez's shoes would have understood that firing five rounds at an individual who is at the wheel of a slowly moving vehicle that "matche[s] the description" of a stolen vehicle violates

the individual's clearly established right to be free from excessive force. Accordingly, Officer Valdez is not entitled to qualified immunity. Count I stands.

## B.    State Law Claims (Counts IV–VII and IX–X)

With respect to the state law claims against Officer Valdez (wrongful death, negligence, gross negligence, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress), he contends these claims must be dismissed for two reasons, neither of which the Court finds persuasive.

First, Officer Valdez argues that, as a police officer, he did not owe Johnson a duty, and even if he did, there was no breach. Dkt. No. 18–19.[6] Such a notion is absurd under the facts alleged. Of course, the general rule is that "[t]he failure of the police to provide protection [against harm from third parties] is ordinarily not actionable," *Ruf v. Honolulu Police Dep't*, 972 P.2d 1081, 1088 (Haw. 1999) (quoting *Freitas v. City & Cty. of Honolulu*, 574 P.2d 529, 532 (1978)), unless there is some "special relationship" between the police officers (or the municipality) and the member of the public that was harmed. *Id.* at 1089. But an exception to this rule exists "*where police action has increased the risk of harm* and there is negligence in providing protection against the enhanced danger." *Freitas*, 574 P.2d at 532 (emphasis added); *Ruf*, 972 P.2d at 1088. Put simply, police officers are under a

---

[6]"Fundamental in any determination of liability for negligence is the existence of [a] duty owed by the putative tortfeasor to the injured person." *Cootey v. Sun Inv.*, 718 P.2d 1086, 1090 (Haw. 1986).

"duty to avoid any affirmative acts which worsen the situation of the plaintiff." *Fochtman v. Honolulu Police & Fire Dep't*, 649 P.2d 1114, 1116 (Haw. 1982).

In this case, the only two individuals involved were Officer Valdez and Johnson, and it is undisputed that it was Officer Valdez's "affirmative acts" (*e.g.*, his decision to initially question Johnson and his subsequent decision to aim his firearm at Johnson and pull the trigger) that placed Johnson in harm's way. Thus, Officer Valdez clearly owed a duty to Johnson. Whether that duty was breached is ordinarily a question for trial. *See Fochtman*, 649 P.2d at 1117.

Second, Officer Valdez asserts he is shielded from liability under the "qualified or conditional privilege" provided by state law. Dkt. No. 21-1 at 18–20. Under Hawaii law, non-judicial employees acting in the performance of their duties enjoy a "qualified or conditional privilege" that protects them from individual liability for tortious acts unless the injured party demonstrates (by clear and convincing evidence) that the employee was "motivated by malice and not by an otherwise proper purpose." *Towse v. State*, 647 P.2d 696, 702 (Haw. 1982); *Medeiros v. Kondo*, 522 P.2d 1269, 1272 (Haw. 1974).

It is uncontested that Officer Valdez was performing his duties as a police officer when the alleged tortious conduct occurred. Officer Valdez, however, argues that "there are no allegations that [he] acted with malice." Dkt. No. 21-1 at 19. To the contrary, Ikeda has alleged that the "actions . . . were done with malice." Dkt.

No. 14, ¶¶ 48, 61.[7]  Moreover, having concluded that Officer Valdez is not entitled to qualified immunity, *supra* Part I.A., it follows that the facts alleged are sufficient to support a finding of "malice" in that a jury could conclude that Officer Valdez acted with "reckless disregard of the law or of a person's legal rights." *Awakuni*, 165 P.3d at 1042.  Additionally, "the issue of the existence of malice is generally for the jury's determination," unless the defendant is entitled to summary judgment. *Towse*, 647 P.2d at 703.  Because this case is not before the Court on a motion for summary judgment, Officer Valdez is not entitled to a qualified privilege at this stage.

For the reasons stated, the state law claims against Officer Valdez are adequately pled, and Officer Valdez's motion to dismiss is DENIED.

## II.    The City's Motion to Dismiss

As to the claims against the City, Ikeda asserts that the City is liable under 42 U.S.C. Section 1983 for Officer Valdez's violations of federal law (Count III), and that the City is liable for Officer Valdez's violations of state law under a negligent training theory (Count VIII) and the doctrine of *respondeat superior* (Count XI). Dkt. No. 14, ¶¶ 39–45, 64–68, 78–83.  The Court concludes, however, that Counts

---

[7]For non-defamation cases, "malice" in the context of an officer asserting qualified privilege is defined in its "ordinary and usual sense" as "[t]he intent, without justification or excuse, to commit a wrongful act[,]" "reckless disregard of the law or of a person's legal rights[,]" and "[i]ll will; wickedness of heart." *Awakuni v. Awana*, 165 P.3d 1027, 1041–42 (Haw. 2007) (alterations in original) (quoting BLACK'S LAW DICTIONARY 977 (8th ed. 2004)).

III and VIII fail. Nonetheless, as explained below, Ikeda's other state law claims may proceed against the City under a *respondeat superior* theory.

### A.    Section 1983 – Municipal Liability Under *Monell* (Count III).

"Local governing bodies . . . can be sued directly under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (internal footnote omitted). But liability attaches only where a "policy or custom" of the municipal entity was the "moving force [behind] the constitutional violation" allegedly committed by the officer. *Id.* at 694.[8]

The City asserts that Ikeda has not satisfied *Monell's* rule. Dkt. No. 17-1 at 6–11. The Court agrees. Count III fails because Ikeda has not alleged sufficient facts regarding a policy, custom, or practice of the City. *AE*, 666 F.3d at 637 (dismissing *Monell* claim because the plaintiff "did not put forth additional facts regarding the specific nature of [the] alleged 'policy, custom or practice'").

Municipal policies and customs include "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). And "[i]n limited circumstances, a local government's decision not to train certain employees . . . may rise to the level of an official government policy

---

[8]The *Twombly-Iqbal* standard "applies to *Monell* claims." *AE ex rel. Hernandez v. Cty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).

for purposes of § 1983." *Id.*; *see also Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (failure to implement procedural safeguards to ensure inmates did not miss their arraignments).

Ikeda's allegations satisfy none of these criteria. Ikeda alleges it was the City's "longstanding practice" of failing to "consider and apply the proper method and level of force" and "properly train Officer Valdez" that caused the constitutional violation in this case. *See* Dkt. No. 14, ¶¶ 39, 43.[9] A failure-to-train constitutes a policy or custom of local government "only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the [officers] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (emphasis added); *Connick*, 563 U.S. at 61. Ikeda's allegations do not satisfy that standard.

"'[D]eliberate indifference' is a stringent standard of fault." *Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). To satisfy the standard requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.*; *Connick*, 563 U.S. at 61 ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed

---

[9]Ikeda also alleges that the City had a "practice, custom, [or] policy" of failing to "adopt and/or condone inaccurate, false, and/or intentionally misleading police reports . . ." Dkt. No. 14, ¶ 39. But unlike in *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002), a false police report or warrant is not what "caused" Johnson's injury in this case. *See Connick*, 563 U.S. at 60; *Monell*, 436 U.S. at 691, 694. Therefore, Ikeda cannot sustain a claim on the basis that the City allegedly maintains a practice of fabricating police reports.

deliberately indifferent if the policymakers choose to retain that program."). Thus, for Ikeda to state a failure-to-train claim against the City under Section 1983, she must allege facts showing that the City's policymakers had "notice that a course of training [was] deficient in a particular respect" and yet they continued to adhere "to an approach that they know or should know has failed to prevent tortious conduct by employees." *Connick*, 563 U.S. at 62 (quoting *Bryan Cty.*, 520 U.S. at 407). There are two ways a plaintiff can make such a showing.

First, it is "ordinarily necessary" for a plaintiff to show "[a] pattern of similar constitutional violations by untrained employees" in order for a municipality to be on notice of a constitutionally significant gap in its training. *Connick*, 563 U.S. at 62 (quoting *Bryan Cty.*, 520 U.S. at 409). But Ikeda has not alleged a pattern of similar incidents where officers have used excessive force. She has tendered only the naked assertion that there is "a longstanding practice" of officers failing to apply the appropriate level of force, without any further factual enhancement. Dkt. No. 14, ¶ 39. That is not enough. *Iqbal*, 556 U.S. at 678; *AE*, 666 F.3d at 637.

Second, in "a narrow range of circumstances . . . the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 63 (quoting *Bryan Cty.*, 520 U.S. at 409). This "rare" exception might apply where, for example, a city "arms its police force with firearms and deploys the

armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Id.* (citing *Canton*, 489 U.S. at 390 n.10).

In the instant case, the allegations do not fall within the narrow range of circumstances for single-incident liability. The problem here is that Ikeda does not allege that the City issues its officers firearms without any training whatsoever on the use of deadly force. In fact, Ikeda has not identified any particular deficiency in the City's use-of-force training, much less that City policymakers had notice of this deficiency. But even if Ikeda had made such an allegation, a plaintiff cannot simply "point to something the city 'could have done' to prevent the unfortunate incident." *Connick*, 563 U.S. at 67 (quoting *Canton*, 489 U.S. at 392).

It is also irrelevant that Ikeda has alleged that Officer Valdez, in particular, was not properly trained. Dkt. No. 14, ¶ 44. The mere fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [City], for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390–91. Nor is it enough "that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* at 391. Indeed, even "adequately trained officers occasionally make mistakes." *Id.* As such,

Count III of the FAC "says little about the [City's use-of-force] training program or the legal basis for holding the [C]ity liable" in this case. *Id.* at 391.

Accordingly, because Ikeda has failed to adequately allege that a policy or custom of the City caused the incident in question, Count III is DISMISSED. Notwithstanding, Ikeda may amend her complaint to correct the deficiencies, if she can do so within the bounds of Rule 11 of the Federal Rules of Civil Procedure.

### B.    State Law Claims Against the City

Ikeda also seeks to hold the City accountable under state law for Officer Valdez's tortious conduct by asserting claims for negligent training (Count VIII) and *respondeat superior* (Count XI).  The City urges the Court to dismiss all tort claims against the City.  *See* Dkt. No. 17-1 at 16, 17.  Because Ikeda has not alleged that Officer Valdez was acting outside the scope of his authority and Ikeda offers only conclusory allegations that the City should have foreseen this incident, Count VIII fails.   As explained below, however, the FAC satisfies the requirements for *respondeat superior* liability, and therefore the City may be held to answer for the tortious conduct of Officer Valdez alleged in Counts IV–VII and IX–X.

### 1.    Negligent Training (Count VIII)

In Count VIII, Ikeda asserts a claim against the City for "Negligent Training." Dkt. No. 14 at 14.  Hawaii law has not explicitly recognized such a claim.  *See, e.g.*, *Hyun Ju Park v. City & Cty. of Honolulu*, 292 F. Supp. 3d 1080, 1102 n.14 (D. Haw.

2018); *Ryder v. Booth*, No. 16-00065, 2016 WL 27 2745809, at *11 (D. Haw. May 11, 2016); *Dowkin v. Honolulu Police Dep't*, No. 10-00087, 2012 WL 3012643, at *3 (D. Haw. July 23, 2012).[10]  Hawaii does, however, recognize a cause of action for negligent supervision or control, *Abraham v. S. E. Onorato Garages*, 446 P.2d 821, 826 (Haw. 1968), and negligent hiring, *Janssen v. Am. Hawaii Cruises, Inc.*, 731 P.2d 163, 166 (Haw. 1987).  Neither claim is viable here.

To state a claim for negligent supervision against an employer, a plaintiff must allege that an employee was "acting outside the scope of [their] employment" when the harm was caused.  *Pulawa v. GTE Hawaiian Tel*, 143 P.3d 1205, 1220 (Haw. 2006).  The face of the FAC contains no such allegation.

A cause of action for negligent hiring "depends upon foreseeability, that is, whether the risk of harm from the dangerous employee to a person such as the plaintiff was reasonably foreseeable as a result of the employment." *Janssen*, 731 P.2d at 166.  Again, the FAC is bereft of any facts indicating that the City could have foreseen the incident in question.

---

[10]The *Ryder* Court relied on the elements required to state a claim for negligent training under California law.  2016 WL 27 2745809, at *12.  Other courts have placed claims for negligent training under the same standard as claims for negligent supervision.  *See, e.g.*, *Hyun Ju Park*, 292 F. Supp. 3d at 1102; *Otani v. City & Cty. of Haw.*, 126 F. Supp. 2d 1299, 1308 (D. Haw. 1998); *cf. Abraham v. S. E. Onorato Garages*, 446 P.2d 821, 826 (Haw. 1968) (holding that a claim for negligent supervision requires a plaintiff to establish "that the employer knew or should have known of the necessity and opportunity for exercising such control").

Notwithstanding these deficiencies, even if this Court were to recognize a cause of action under Hawaii law for "negligent training," Ikeda still has no claim. The key to such a claim is "foreseeability." *Otani*, 126 F. Supp. 2d at 1308. "If an employer has not been put on notice of the necessity for exercising a greater degree of control or supervision over a particular employee, the employer cannot be held liable as a matter of law." *Id.*

Setting aside the conclusory allegations in the FAC, Ikeda argues that the City was on notice of Officer Valdez's propensity for using excessive force. Dkt. No. 20 at 19–20. In support, Ikeda points to *Kaahu v. Randall*, No. 14-00266, 2018 WL 472996, at *8–9 (D. Haw. Jan. 18, 2018), a case in which it was alleged Officer Valdez used excessive force.[11] But one incident hardly serves as "notice," much less one incident in which liability under a set of dissimilar facts was never determined because the dispute ended in a settlement agreement.[12] Further, as explained *supra* Part II.A., Ikeda has not alleged *facts* that suggest the City negligently trained its officers regarding the use of force.

---

[11]Courts may take "judicial notice of matters of public record" in ruling on a motion to dismiss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).
[12]*See* Settlement on the Record, *Kaahu v. Randall*, No. 14-00266-HG-RLP, (D. Haw. May 10, 2018), ECF No. 229.

Accordingly, Ikeda has failed to state a claim for negligent hiring, supervision, or training under Hawaii law. Count VIII is therefore DISMISSED, but Ikeda is granted leave to amend.

### 2. *Respondeat Superior* **(Count XI)**

To avoid *respondeat superior* liability, the City recycles many of the same arguments made in Officer Valdez's motion, *i.e.*, the absence of any duty owed and derivative immunity by virtue of its employees being shielded by the state qualified or conditional privilege. Dkt. No. 17-1 at 14–15; Dkt. No. 22 at 6. As concluded above, these arguments are without merit.[13]

In Hawaii, municipalities are "subject to the state's tort laws in the same manner as any other private tortfeasor." *Kahale v. City & Cty. of Honolulu*, 90 P.3d 233, 241 (Haw. 2004) (collecting cases). As such, the City "is liable for the tortious conduct of [an agent or officer] under the doctrine of *respondeat superior*." *See*, *e.g.*, *Orso v. City & Cty. of Honolulu*, 534 P.2d 489, 494 (Haw. 1975); *see also Pourny v. Maui Police Dep't*, 127 F. Supp. 2d 1129, 1145 (D. Haw. 2000). "[T]o recover under the *respondeat superior* theory, a plaintiff must establish: 1) a negligent act of the employee . . . ; and 2) that the negligent act was within the

---

[13]The City advances two additional arguments: (i) statute of limitations; and (ii) standing under Section 1983 (Dkt. No. 22 at 2, 10), neither of which merits a discussion. Both arguments were raised for the first time in the City's reply brief and therefore "shall be disregarded" pursuant to Local Rule 7.2. Further, the statute of limitations argument was expressly withdrawn at oral argument by counsel for the City. Dkt. No. 27.

employee's scope of employment." *Wong-Leong v. Hawaiian Indep. Refinery*, 879 P.2d 538, 543 (Haw. 1994).[14] The FAC satisfies both elements.

Ikeda alleges Officer Valdez was acting in the scope of his employment at the time of the incident. Dkt. No. 14, ¶ 79.[15] Moreover, the City is not entitled to a qualified privilege under state law because, as explained above, Officer Valdez is not entitled to that protection.[16] Therefore, because a jury could conclude that Officer Valdez engaged in the tortious conduct alleged, the City may be held vicariously liable. Accordingly, in light of Count XI, Ikeda has stated a claim under Counts IV–VII and IX–X against the City.

## C. Punitive Damages

The final issue is punitive damages. While punitive damages are available in an action against an officer under either Section 1983, *Smith v. Wade*, 461 U.S. 30, 56 (1983), or Hawaii tort law, *see Lauer v. YMCA*, 557 P.2d 1334, 1342 (Haw. 1976), Ikeda is precluded from such relief insofar as she seeks a punitive damages award against the City.

---

[14]Contrary to the City's position, (Dkt. No. 17-1 at 15–16), the "focus" in analyzing *respondeat superior* liability is "completely on the actions of the employee." *Wong-Leong*, 879 P.2d at 543. Therefore, Ikeda "need not show any act or fault of the [City] . . ." *Id.*

[15]Notably, this is contrary to what Ikeda must plead to state a claim for negligent supervision. *Pulawa*, 143 P.3d at 1220. But a plaintiff is permitted to plead separate and inconsistent claims. *See* Fed.R.Civ.P. 8(d)(3).

[16]*See, e.g.*, *Reed v. City & Cty. of Honolulu*, 873 P.2d 98, 106 (Haw. 1994) ("[U]nder the doctrine of *respondeat superior*, . . . if an employee is immune from suit, then the employer is also immune from suit and cannot be held liable.").

It is well established that "a municipality is immune from punitive damages under 42 U.S.C. § 1983," *Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981), and the same applies under Hawaii law for state law claims. *Lauer*, 557 P.2d at 1342. Therefore, Ikeda's prayer for punitive damages against the City is DISMISSED WITH PREJUDICE since leave to amend would be futile.

For Ikeda to recover punitive damages against Officer Valdez, she "must prove by clear and convincing evidence" that Officer Valdez "acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Kekona v. Bornemann*, 349 P.3d 361, 263 (Haw. 2015) (quoting *Masaki v. Gen. Motors Corp.*, 780 P.2d 566, 575 (1989)). "The standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005); *cf. Smith*, 461 U.S. at 48, 56. Whether to award punitive damages "is within the sound discretion of the trier of fact." *Kekona*, 349 P.3d at 262–63.

Based upon the facts alleged in the FAC, a jury could find that Officer Valdez's conduct was the product of "wilful misconduct" or "entire want of care" sufficient to support an award of punitive damages. Therefore, Ikeda has stated a claim for punitive damages against Officer Valdez.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendant Scott Valdez's Motion to Dismiss the First Amended Complaint (Dkt. No. 17) and Defendant City & County of Honolulu's Motion to Dismiss the First Amended Complaint (Dkt. No. 21) are GRANTED IN PART and DENIED IN PART.

With respect to all Defendants, the First Amended Complaint (Dkt. No. 14), is DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND as to Count I, insofar as it asserts a claim under the Fifth and Fourteenth Amendments to the U.S. Constitution, and as to Count II.

With respect to Defendant City & County of Honolulu, the First Amended Complaint (Dkt. No. 14) is DISMISSED IN PART WITH LEAVE TO AMEND as to Count III and Count VIII and DISMISSED IN PART WITHOUT LEAVE TO AMEND as to Ikeda's prayer for punitive damages.

Defendants' motions are DENIED in all other respects.

Ikeda may have until **October 25, 2019,** to file an amended complaint to the extent allowed herein. **The Court cautions Ikeda that failure to file an amended complaint by October 25, 2019, and include in it those claims not dismissed**

herein may result in the dismissal of those claims that the Court has only thus far dismissed with leave to amend in this Order.

IT IS SO ORDERED.

DATED: September 25, 2019 at Honolulu, Hawaiʻi.



_____
Derrick K. Watson
United States District Judge

_____
*Muriel Ikeda v. City & County of Honolulu, et al.*, Civil No. 19-00009 DKW-KJM;
**ORDER (1) GRANTING AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS; AND (2) DISMISSING COMPLAINT IN PART WITH PARTIAL LEAVE TO AMEND**